United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KHALIL JANJUA,

    Plaintiff,

v.

DONALD NEUFELD, et al.,

    Defendants.

Case No. 15-cv-05475-EMC

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Docket Nos. 28, 30

    Plaintiff Khalil Janjua has filed suit against various federal government entities and employees (all individuals have been sued in their official capacities). His basic contention is that the United States Citizenship and Immigration Service ("USCIS") improperly denied his application for adjustment of status, *i.e.*, from refugee to lawful permanent resident ("LPR"). Currently pending before the Court are the parties' cross-motions for summary judgment. The main issue for the Court to decide is whether the federal government is collaterally estopped from denying Mr. Janjua adjustment of status on the ground that he previously engaged in terrorist activities.

    Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** Mr. Janjua's motion and **GRANTS** the government's.

## I. FACTUAL & PROCEDURAL BACKGROUND

A.   <u>Asylum and Adjustment of Status of Refugees</u>

    Before discussing the factual and procedural background specific to this case, the Court briefly provide some general legal background that is relevant to the pending motions.

**Asylum.** The statute generally applicable for asylum is 8 U.S.C. § 1158. Under § 1158, "[a]ny alien who is physically present in the United States or who arrives in the United States . . . may apply for asylum." 8 U.S.C. § 1158(a). "The Secretary of Homeland Security or the Attorney General may grant asylum . . . if [he or she] determines that such alien is a refugee within the meaning of section 101(a)(42)(A) [8 U.S.C. § 1101(a)(42)(A)]." *Id.* § 1158(b)(1)(A).

"The term 'refugee' means (A) any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear or persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42(A).

An alien, however, is generally not eligible for asylum if he or she has engaged in terrorist activity as defined by 8 U.S.C. § 1182. *See id.* § 1158(b)(2)(A)(v) (referring to an "alien described in subclause (I), (II), (III), (IV), or (VI) of section 212(a)(3)(B)(i) [8 U.S.C. § 1182(a)(3)(B)(i)]"); *id.* §1182(a)(3)(B)(i) (addressing aliens inadmissible on the basis of terrorist activities). Engaging in terrorist activity includes soliciting funds or other things of value for a terrorist organization and affording material support to a terrorist organization. *See id.* § 1182(a)(3)(B)(iv)(IV), (VI).

**Adjustment of status of refugees.** The statute generally applicable for adjustment of status of refugees is 8 U.S.C. § 1159. Under § 1159, a refugee may have his or her status adjusted to a LPR if he or she "has been physically present in the United States for at least one year after being granted asylum," "continues to be a refugee," and "is admissible . . . as an immigrant under this Act at the time of examination for adjustment of such alien." *Id.* § 1159(b). Based on the last factor, § 1182 – which governs inadmissibility for aliens – comes into play and, as indicated above, an alien is not admissible if he or she has engaged in terrorist activity. *See id.* § 1182(a)(3)(B)(i).

Thus, "both 8 U.S.C. § 1158 (the statute governing petitions for asylum) and 8 U.S.C. § 1159 (the statute governing petitions for permanent resident status), look to 8 U.S.C. § 1182 (the statute governing inadmissible aliens) to determine whether an alien is eligible for relief." *Amrollah v. Napolitano*, 710 F.3d 568, 571 (5th Cir. 2013).

B.   Mr. Janjua's Applications for Asylum and Adjustment of Status

Having addressed the general legal background, the Court now turns to the specific factual and procedural background in the case at hand.

Mr. Janjua is a native and citizen of Pakistan. *See* CAR 555 (application for asylum). He applied for asylum in the United States in or about November 1999. *See* CAR 554 (acknowledgment of receipt of application). In a statement in support of his application, Mr. Janjua explained that he was seeking asylum because his "life was in danger in [his] home country Pakistan," more specifically, as a result of his status as a "Muhajir" and his membership and participation in an organization known as the Muhajir Qaumi Movement ("MQM"). *See* CAR 564 (attachment to asylum application) (indicating that Muhajir status relates to a person's or relative's immigrating to Pakistan from India).

In January 2000, the agency then-known as the Immigration and Naturalization Service ("INS") rejected Mr. Janjua's application for asylum, stating that he had "not demonstrated with clear and convincing evidence that [his] application was filed within one year of [his] last arrival." CAR 547 (rejection notice). INS then initiated removal proceedings against him, asserting that Mr. Janjua was "an alien present in the United States who has not been admitted or paroled." CAR 544 (notice to appear). In response, Mr. Janjua asked for relief from removal based on, *inter alia*, asylum. *See* CAR 440 (application for asylum and/or withholding of removal). In September 2000, an immigration judge denied his request for relief. *See* AR 421 (IJ order).

Mr. Janjua subsequently appealed the immigration judge's order to the Board of Immigration Appeals ("BIA"), asserting that "there exists a clear probability of persecution on the basis of [his] ethnicity and political opinion should he be forced to return [to Pakistan]." CAR 218 (Mr. Janjua's appellate brief). In July 2003, the BIA remanded the case to the immigration court "for further consideration of the credibility of [Mr. Janjua's] claim." CAR 209 (BIA order). In April 2007, an immigration judge granted Mr. Janjua's asylum application. *See* CAR 53-53 (letter and IJ order).

In December 2008, Mr. Janjua filed an application to adjust his status to a LPR. *See* CAR 31, 36 (application to register permanent residence or adjust status). Because USCIS did not

3

render a decision on his application, Mr. Janjua initiated the instant action in November 2015. *See* Docket No. 1 (complaint). In January 2016, USCIS contacted Mr. Janjua and asked him to submit evidence in support of his application. *See* CAR 25 (request for evidence). After Mr. Janjua responded, *see* CAR 27-28 (response to request for evidence), USCIS issued a notice of intent to deny in June 2016. *See* CAR 21 (notice of intent to deny). Thereafter, in August 2016, USCIS issued a formal decision, denying adjustment of status. *See* CAR 1 (decision). USCIS stated in relevant part:

> [Y]ou are inadmissible under INA section 212(a)(3)(B)(i)(I) for having engaged in terrorist activities as defined by section 212(a)(3)(B)(iv)(VI)(dd) for the voluntary provision of material support to an undesignated terrorist organization when you distributed flyers, organized meetings and rallies, hung posters, provided tent service for the MQM and the MQM(A) and started a new MQM office. You are also inadmissible under INA section 212(a)(3)(B)(i)(I) as defined by section 212(a)(3)(B)(iv)(IV)(cc) for soliciting funds or other things of value when you collected donations for the MQM.

CAR 3. In response to Mr. Janjua's "conten[tion] that USCIS is collaterally estopped from finding [him] inadmissible for terrorist-related activities because the issue was previously litigated when [he was] granted asylum," USCIS disagreed, stating as follows:

> Your grant of asylum in 2007 and the current adjudication of your Application to Adjust Status are separate decisions. In order to adjust status under INA section 209(b), you must be admissible at the time of examination for adjustment of status. The decision on your Application to Adjust Status is not bound by the decision on a prior benefit adjudication.

CAR 3.

Mr. Janjua then amended his complaint to challenge the above ruling by USCIS. *See* Docket No. 17 (first amended complaint ("FAC")). According to Mr. Janjua, the USCIS decision should be set aside because it "is arbitrary, capricious, wholly unsupported by substantial evidence, and otherwise not in accordance with law." FAC ¶ 1 (citing the Administrative Procedure Act ("APA")); *see also* 5 U.S.C. § 706(2).

///

///

4

## II. **DISCUSSION**

A. Legal Standard

> Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Where the district court reviews an administrative action pursuant to the APA, summary judgment is an appropriate mechanism for deciding the purely legal question of whether the agency could have reasonably reached the decision that it did. *Occidental Engineering Co. v. I.N.S.*, 753 F.2d 766, 769-70 (9th Cir. 1985).

*Or. Nat. Desert Ass'n v. McDaniel*, No. CV 09-369-PK, 2011 U.S. Dist. LEXIS 45938, at *21-22 (D. Or. Apr. 28, 2011); *see also San Luis & Delta-Mendota Water Auth. v. United States DOI*, No. 1:11-cv-00952 LJO GSA, 2015 U.S. Dist. LEXIS 24970, at *21-22 (E.D. Cal. Mar. 2, 2015) (noting that "[a] court conducting APA judicial review may not resolve factual questions, but instead determines 'whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did'"; adding that "'the standard set forth in Rule 56[(a)] does not apply because of the limited role of a court in reviewing the administrative record'" and that, "[i]n this context, summary judgment becomes the 'mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review'").

As indicated above, under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court shall do the same for agency action, findings, and conclusions "unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute." *Id.* § 706(2)(e). If however the agency action is not arbitrary, and accords with law and is supported by substantial evidence, it must be upheld.

B. Collateral Estoppel in Immigration Proceedings

According to Mr. Janjua, collateral estoppel bars USCIS from denying his application for adjustment of status on the basis that he had previously engaged in terrorist activity. More

specifically, Mr. Janjua contends as follows: (1) his application for adjustment of status was denied (in August 2016) based on his membership/participation in MQM but (2) such facts related to MQM were known to the immigration judge who considered his application for asylum, (3) that judge would have been required to deny the asylum application if he determined that those facts constituted engagement in terrorist activity, (4) that judge did not deny the asylum application but rather granted the application (in April 2007), thus implicitly finding that Mr. Janjua had not engaged in terrorist activity based on those facts, and (5) as a result, the USCIS is precluded from relitigating the issue of whether his membership/participation in MQM constituted engagement in terrorist activity for purposes of 8 U.S.C. § 1182(a)(3)(B)(i).

As an initial matter, the government argues that the Court need not reach the merits of Mr. Janjua's collateral estoppel argument because collateral estoppel does not apply in immigration proceedings where are governed by the Immigration and Nationality Act ("INA"). The government notes that, in *Astoria Federal Savings & Loan Association v. Solimino*, 501 U.S. 104 (1991), the Supreme Court stated that "[w]e have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality," *but*, "when the interpretation of a statute at hand, . . . the question is not whether administrative estoppel is wise but whether it is intended by the legislature." *Id.* at 107-08. While, in general, "courts may take it as given that Congress has legislated with an expectation that the principle [of preclusion] will apply," that is not the case "'when a statutory purpose to the contrary is evident.'" *Id.* at 108. An evident statutory purpose does not mean that there must be a "clear statement" by Congress of an "intent[] to overcome the presumption's application to a given statutory scheme." *Id.*

In *Astoria* itself, the Supreme Court considered "whether claimants under the Age Discrimination in Employment Act of 1967 . . . are collaterally estopped to relitigate in federal court the judicially unreviewed findings of a state administrative agency made with respect to an age-discrimination claim." *Id.* at 106. The Court ultimately held that "such findings have no preclusive effect on federal proceedings," *id.*, explaining as follows.

> [T]he Age Act . . . carries an implication that the federal courts should recognize no preclusion by state administrative findings with respect to age-discrimination claims. While the statute contains no express delimitation of the respect owed to state agency findings, its filing requirements make clear that collateral estoppel is not to apply. Section 14(b) requires that where a State has its own age-discrimination law, a federal Age Act complainant must first pursue his claim with the responsible state authorities before filing in federal court. It further provides that "no suit may be brought under [the Age Act] before the expiration of sixty days after proceedings have been commenced under the State law, unless such proceedings have been earlier terminated." The deadline for filing with the EEOC likewise refers to the termination of prior state administrative action, § 7(d)(2) providing that where § 14(b) applies "such a charge shall be filed . . . within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier." Both provisions plainly assume the possibility of federal consideration after state agencies have finished theirs.
>
> And yet such federal proceedings would be strictly *pro forma* if state administrative findings were given preclusive effect. . . . A complainant who looks to a federal court after termination of state proceedings will . . . ordinarily do so only when the state agency has held against him. In such a case, however, the employer would likely enjoy an airtight defense of collateral estoppel if a state agency determination on the merits were given preclusive effect. Insofar as applying preclusion would thus reduce to insignificance those cases in which federal consideration might be pursued in the wake of the completed proceedings of state agencies, § 14(b)'s provision for just such consideration would be left essentially without effect. But of course we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof.

*Id.* at 110-12.

In the instant case, the government argues that Congress did not intend for collateral estoppel to apply because there are "separate statutory provisions for asylum and asylum-based adjustment of status," Opp'n a 12 – *i.e.*, 8 U.S.C. § 1158 for asylum and § 1159(b) for adjustment of status of asylees – and "USCIS is required by . . . § 1159(b)(5) to determine [an alien's] admissibility at the time of adjudicating his adjustment of status application." Mot. at 12; *see also* 8 U.S.C. § 1159(b)(5) (providing that an alien who has been granted asylum may have his or her status adjusted to a LPR if he or she "is admissible . . . as an immigrant under this Act at the time of examination for adjustment of such alien"). But the requirement of § 1159(b)(5) simply reflects that new facts can arise or be discovered between the time that an alien is granted asylum and the time that the alien asks for adjustment of his status from asylee to LPR. Indeed, that was the

7

conclusion reached by Judge Seeborg in *Islam v. United States Department of Homeland Security*, 136 F. Supp. 3d 1088 (N.D. Cal. 2015):

> Defendant's interpretation of the phrase "at the time" in 8 U.S.C. § 1159(b)(5) as reflecting Congress's intent to foreclose collateral estoppel is unwarranted. As plaintiff points out, a change in facts or circumstances would make it necessary for a judge to reevaluate an asylee's admissibility at the time of examination for adjustment. For example, if new facts arose that were not known to the IJ in Islam's asylum proceeding about his involvement in terrorist activities, then it would be necessary to reevaluate his admissibility under § 1182(a). No such circumstance is present here as all parties agree Islam's relevant activity ended in 1997, well before the 2007 asylum hearing.

*Id.* at 1093.

Judge Seeborg also addressed the need for separate statutory provisions for asylum and asylum-based adjustment of status, which has nothing to do with an intent to bar application of collateral estoppel: "[T]he two step process is not indicative of the legislative intent to bar collateral estoppel. *The second step (for adjustment of status) includes a number of bars to admissibility that do not apply to asylum applicants. See* 8 U.S.C. §1182(a)(1)-(10)." *Id.* at 1093 (emphasis added); *see also* Reply at 3 (arguing that, "when an asylee applies for adjustment of status, the USCIS must consider numerous grounds of inadmissibility *for the first time*, including whether the asylee has a communicable disease of public health significance and whether there is a 'reason to believe' that he has sold a controlled substance or helped another person do so") (footnotes omitted; emphasis in original). In its sur-reply, the government fails to address this point, simply arguing that admissibility is different from asylum eligibility. *See, e.g.*, Sur-Reply at 5 (arguing that asylum is simply relief from removal and not admission). While that is true, that does not detract from the fact that the same sub-issue – engagement in terrorist activity – is a consideration for both admissibility and asylum eligibility. The point is that the application of collateral estoppel – which acts to bar relitigation of specific issues where the elements of the doctrine are satisfied – does not negate the distinction between asylum and adjustment proceedings.

Other courts have reached the same conclusion that collateral estoppel may apply. For example, in *Amrollah*, the plaintiff (like Mr. Janjua here) was granted asylum and subsequently

8

sought adjustment of status. The government denied the plaintiff's application for permanent resident status on the ground that he had engaged in terrorist activity. The plaintiff contended that "the government was collaterally estopped from finding that he engaged in terrorist activity under [§ 1182], because his grant of asylum necessarily included a determination that he did not provide material support to a terrorist organization or member of such organization," and the Fifth Circuit agreed. *Id.* at 571. In *Khan v. Johnson*, 160 F. Supp. 3d 1199 (C.D. Cal. 2016), the district court evaluated §§ 1158 and 1159 just as Judge Seeborg did, explaining that "the purpose of the second inquiry is to evaluate any new circumstances that may have arisen or any facts that have come to light during the one year period applicants are required to wait between when they are granted asylum and when they apply for permanent residency"; "in cases such as this, where the parties appear to concede that no material facts have changed since the applicant was granted asylum, permitting the same issue to be adjudicated twice would only cause inefficiency and potentially result in inconsistent decisions." *Id.* at 1207-08.

In addition, other authority, including from the Ninth Circuit, indicates that collateral estoppel does generally apply in immigration proceedings. *See Duvall v. AG of the United States*, 436 F.3d 382, 388, 391 (3d Cir. 2006) (stating that "[t]he structure of the INA is consistent with collateral estoppel," that "the INA itself recognizes that collateral estoppel will be applied in immigration proceedings," and that "agency practice . . . supports incorporation of common law principles of preclusion"; adding that "[l]egislative policy dictates that the bar against relitigation must drop [only] when the alien *continues* to commit criminal acts after initial immigration proceedings") (emphasis added); *Belayneh v. I.N.S.*, 213 F.3d 488, 492 (9th Cir. 2000) (stating that, as a general matter, "[i]ssue preclusion applies to immigration proceedings"); *Ramon-Sepulveda v. INS*, 824 F.2d 749, 750-51 (9th Cir. 1987) (stating that, "[b]ecause the immigration judge's initial decision is res judicata, the INS at the very least is precluded from seeking to deport petitioner based on matters that were resolved in earlier deportation proceedings); *Sile v. Napolitano*, No. 09 C 5053, 2010 U.S. Dist. LEXIS 46406, at *7-11 (N.D. Ill. May 12, 2010) (holding that USCIS was "collaterally estopped in classifying [applicant] as ineligible for adjustment of status on the ground of firm resettlement" when issue of "firm resettlement" had

9

already been adjudicated in an earlier asylum proceeding).

Defendants have not cited any persuasive evidence or authority that Congress intended otherwise.[1] Accordingly, the Court rejects the government's contention that Congress did not intend for collateral estoppel to apply to immigration proceedings, in particular, §§ 1158 and 1159.

C.  Other Grounds to Avoid Collateral Estoppel

Implicitly recognizing the problems with its position above, the government – again for the first time in sur-reply – raises new arguments in the attempt to avoid collateral estoppel.

For example, the government points out that, under 8 U.S.C. § 1159(c),[2] it "may *not* waive inadmissibility for terrorist grounds under 8 U.S.C. § 1182(a)(3)(B)," Sur-Reply at 4 (emphasis in original), but that is beside the point. Waiver is a different issue from collateral estoppel.

Also, the government argues that, under *Title v. Immigration & Naturalization Service*, 322 F.2d 21 (9th Cir. 1963), the Court should decline to apply collateral estoppel based on fairness grounds. But *Title* is easily distinguished. In *Title*, the petitioner was naturalized as an American citizen but then a district court revoked his naturalization order on the ground that it was procured by concealment of a material fact – *i.e.*, that he had previously been a member of the Communist Party of the United States. The petitioner appealed the district court's revocation but the appeal was later dismissed for want of prosecution. *See id.* at 22.

Subsequently, the INS issued an order charging that the petitioner was subject to deportation pursuant to then 8 U.S.C. § 1251(a)(6)(C). Under this statute, "it is not sufficient to prove merely that an alien has been a member of the Community Party; it must be shown in

---

[1] The government has cited only one case in support of its position that collateral estoppel has no applicability given the structure of §§ 1158 and 1159. That case is *Mugomoke v. Hazuda*, No. 13-cv-00984-KJM-KJN, 2014 U.S. Dist. LEXIS 128055 (E.D. Cal. Sept. 11, 2014). (The government did not mention *Mugomoke* in its opposition brief but identified it for the first time in its sur-reply – thus depriving Mr. Janjua of the opportunity to respond.) The Court does not find *Mugomoke* persuasive. Moreover, *Mugomoke* is distinguishable from the instant case because, there, the "plaintiff's asylum application was granted by the asylum office," *id.* at *20 – *i.e.*, instead of an IJ, as here.

[2] Section 1159(c) provides in relevant part that "the Secretary of Homeland Security or the Attorney General may waive any other provision of such section (*other than* paragraph (2)(C) or subparagraph (A), *(B)*, (C), or (F) *of paragraph (3)*) with respect to such an alien for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. § 1159(c) (emphasis added; referring to, *inter alia*, § 1182(a)(3)(B)(i)).

addition that the alien was aware of the 'distinct and active political' nature of the Party and had a 'meaningful association' with the Party." *Id.* at 23. At the deportation hearing, "the government introduced into evidence the following documents from petitioner's denaturalization case as establishing, under the doctrine of collateral estoppel, petitioner's membership in the Communist Party and the nature of that membership: Complaint; Opinion; Findings of Fact and Conclusions of law; [and] judgment." *Id.* The special inquiry officer concluded that the doctrine of collateral estoppel did apply and therefore did not allow the petitioner to present evidence at the deportation hearing. *See id.* The petitioner thereafter appealed to the BIA but did not prevail.

The Ninth Circuit stated that the issue before it was

> whether the order of deportation outstanding against petitioner is based upon 'reasonable, substantial, and probative evidence,' as required by section 242(b) of the Immigration and Nationality Act (8 U.S.C. § 1252(b)). Since the only evidence presented at the deportation hearing was adduced under the doctrine of collateral estoppel, the resolution of this issue depends upon whether that doctrine was properly applied and if properly applied, whether the evidence so adduced meets the standards required for deportation.
>
> We do not feel that the doctrine of collateral estoppel should have been applied in this case. Its application had the effect of depriving petitioner of the hearing guaranteed him by section 242 of the Immigration and Nationality Act of 1952 (8 U.S.C. § 1252(b)). Under that statute, 'the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence in his own behalf, and to cross-examine witnesses presented by the Government.' *It is expressly provided in the statute that the 'procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section.'* As a result of his denaturalization in 1955, petitioner became an alien and as such was subject to the deportation laws. *To hold, however, that the hearing he received at the time of his denaturalization takes the place of the hearing procedure provided for in section 242 would, we think, clearly thwart the intention of Congress.* We recognize that the purpose of the doctrines of res judicata and collateral estoppel is to preclude the relitigation of issues previously determined between the same parties and that the application of the doctrines in many cases will have the practical effect of preventing the party against whom the issue was determined from again presenting evidence on that issue. We merely hold that *Congress has evinced its intention that an alien have a right to present evidence at a hearing held for the purpose of determining his deportability*.

*Id.* at 23-24 (emphasis added).

Given the language above, it is clear that the *Title* court was simply hewing to the intent of

11

Congress – but here (as discussed above) there is nothing to show that the intent of Congress was not to have collateral estoppel apply. Admittedly, the *Title* court later talked about fairness as well, which is the point on which the government focuses. *See id.* at 24 ("Further, we think that the application of the doctrine of collateral estoppel would, *apart from the provisions of section 242*, be unfair in this case. It has been recognized that the doctrine should not be exercised in such a manner as to work an injustice.") (emphasis added). But the fairness inquiry of the *Title* court was animated by the fact that an *individual's* liberty was at stake. *See id.* at 24. The *Title* court did not suggest there is any inherently unfair when governmental interests as opposed to individual interests are at stake. In addition, the *Title* court found it important to take into account that,

> that at the time of [the petitioner's] denaturalization proceedings, 'meaningful association' had not been announced as the test for deportability by the Supreme Court and had not been defined by that Court. Assuming arguendo that the doctrine should be applied in deportation proceedings, had petitioner known that the test for deportability was 'meaningful association' with the Party and that the facts proved in the denaturalization proceedings would tend to show such an association, he may have proceeded differently.

*Id.* at 24-25.

Accordingly, the Court concludes that Mr. Janjua's collateral estoppel argument must be evaluated on the merits.

D. <u>Elements of Collateral Estoppel</u>

According to the government, even if collateral estoppel is applicable in immigration proceedings, it – and not Mr. Janjua – is still entitled to summary judgment because the elements of collateral estoppel cannot be satisfied in the instant case. More specifically, the government asserts (1) "[a] party cannot claim estoppel *against the government* when he has not lost any right to which he is entitled," Opp'n at 15 (emphasis added), (2) the terrorism inadmissibility bar was not previously "actually litigated" and "necessarily decided" when the first immigration judge granted Mr. Janjua asylum (in April 2007), and (3) the issues considered in the asylum proceedings were not identical to those considered in the adjustment-of-status proceedings.

The government's first argument is not persuasive. It depends on *Sulit v. Schiltgen*, 213

F.3d 449 (9th Cir. 2000), where the Ninth Circuit stated: "[E]stoppel against the government is unavailable where petitioners have not lost any rights to which they were entitled." *Id.* at 454. But *Sulit* involved *equitable* estoppel, not *collateral* estoppel, and there is nothing in the opinion to suggest that the Ninth Circuit was talking about any kind of estoppel, as opposed to equitable estoppel specifically, in making the above statement. Estoppel here is not invoked against the government as a litigating party; rather it is invoked to accord finality to an adjudicating agency decision.

Likewise, the Court is not persuaded by the government's third argument. Just because asylum and adjustment of status involve "different benefits," Opp'n at 19, does not mean that there is not the identical issue of whether terrorism would be a bar, *i.e.*, to either asylum or adjustment of status. As noted above, the identical issue of whether the applicant has engaged in terrorist activities is involved in both proceedings. As for the government's point that adjustment of status is evaluated at the time of the application for adjustment of status, *see* Opp'n at 20, it is true (as noted above) that new facts can arise or be discovered after the grant of asylum which can defeat collateral estoppel. But in this case, the government has not pointed to any new facts since the grant of asylum that should be taken into consideration.

While for the reasons stated above, the Court is not persuaded by the government's first and third arguments, it does find merit to the government's second argument. Under Ninth Circuit law,

> [c]ollateral estoppel applies to a question, issue, or fact when four conditions are met: (1) the issue at stake was identical in both proceedings; (2) *the issue was actually litigated and decided in the prior proceedings*; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits.

*Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012) (emphasis added); *see also Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992) ("To foreclose relitigation of an issue under collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.").

13

The Court disagrees with the government's position that the immigration judge, during the asylum proceedings, did not necessarily decide the issue of whether Mr. Janjua had engaged in terrorist activity. In *Clark*, 966 F.2d 1318 (9th Cir. 1992), the Ninth Circuit noted as follows: "When the issue for which preclusion is sought is the only rational one the factfinder could have found, then that issue is considered foreclosed, even if no explicit finding of that issue has been made." *Id.* at 1321. In other words, "[a]n issue may be actually decided even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary component of the decision reached in the prior litigation." *Stoehr v. Mohamed*, 244 F.3d 206, 208 (1st Cir. 2001) (internal quotation marks omitted). In the instant case, the immigration could not have reached a conclusion that asylum was appropriate for Mr. Janjua if the immigration judge determined that Mr. Janjua had in fact engaged in terrorist activity. *See Amrollah*, 710 F.3d at 572 (noting that "the immigration judge was *not permitted* to grant asylum to Amrollah if he satisfied any of the exceptions to admissibility under § 1182, including providing material support to any individual or organization that engaged in terrorist activities"; thus stating that "the IJ's ruling that Amrollah was admissible necessarily included, under the structure of the statute, a finding that Amrollah did not provide support to an individual or organization that engaged in terrorist activities") (emphasis in original). Therefore, contrary to what the government asserts, the immigration judge necessarily decided (even if only implicitly) that Mr. Janjua had not engaged in terrorist activity.

That being said, the "necessarily decided" element of collateral estoppel cannot be conflated with the "actually litigated" element of collateral estoppel. *See, e.g.*, *United States v. Beane*, 841 F.3d 1273, 1283 (11th Cir. 2016) (noting that, under res judicata, "'a judgment in a prior suit between the same parties bars a suit on the same cause of action not only as to all matters offered at the first proceeding, but also as to all issues that could have been litigated'"; in contrast, collateral estoppel "'precludes relitigation only of those issues actually litigated in the original action, whether or not the second suit is based on the same cause of action'"); *see also* 18-132 Moore's Fed. Prac. – Civ. § 132.03[2][a] (stating that "[i]ssues preclusion, in contrast to claim preclusion, applies only to issues that were directly litigated and not to those that merely could have been litigated"). Just because the issue was necessarily decided does not necessarily mean it

14

was actually litigated under federal collateral estoppel doctrine.

Mr. Janjua suggests otherwise, relying on *In re Harmon*, 250 F.3d 1240 (9th Cir. 2011). There, the Ninth Circuit stated that, "[a]s a conceptual matter, if an issue was necessarily decided in a prior proceeding, it was actually litigated." *Id.* at 1248. "The converse proposition, by contrast, is not true. An issue may actually have been litigated without its determination having been necessary to the court's decision." *Id.* at 1248 n.9. But the Ninth Circuit made this statement in discussing *California* law on collateral estoppel. *See id.* at 1248; *see also In re Baldwin*, 249 F.3d 912, 919 (9th Cir. 2001) (stating that, "under California law, in order for us to conclude that the issue had been actually litigated in the prior proceeding, we must either find that the court made an express finding on the issue or we must conclude that the issue was necessarily decided in the prior proceeding"). Mr. Janjua has failed to cite any authority stating that *federal* law on collateral estoppel uses the same approach.

Indeed, a number of cases indicate otherwise – *i.e.*, that "actually litigated" means that the issue was "contested by the parties and submitted for determination by the court." *Breen v. Chao*, No. 05-0654 (PLF), 2017 U.S. Dist. LEXIS 80958 (D.D.C. May 26, 2017); *see also In re Keaty*, 397 F.3d 264, 272 (5th Cir. 2015) ("The requirement that an issue be 'actually litigated' for collateral estoppel purposes simply requires that the issue is raised, contested by the parties, submitted for determination by the court, and determined."); *Gambino v. Koonce*, 757 F.3d 604, 608-09 (7th Cir. 2014) ("[A]ctually litigated does not mean thoroughly litigated, but only that the parties disputed the issue and the trier of fact resolved it. It can be satisfied even if only a slight amount of evidence was presented on the disputed matter decided in the first suit.") (internal quotation marks omitted); *Swentek v. USAIR, Inc.*, 830 F.2d 552, 561 (4th Cir. 1987) ("Collateral estoppel is appropriate where the identical issue was 'actually litigated, that is, contested by the parties and submitted for determination by the court,' where the issue was 'actually and necessarily determined by a court of competent jurisdiction,' and where preclusion does not work an unfairness in the second trial."); 18-132 Moore's Fed. Prac. – Civ. § 132.03[2][a] ("The 'actually litigated' requirement simply requires the issue to have been raised, contested by the parties, submitted for determination by the court, and determined."). Mr. Janjua has cited no case

15

or federal law to the contrary.

Mr. Janjua asserts that, even if "actually litigated" means contested by the parties and submitted for determination, he still has met that standard here. Mr. Janjua underscores that his application for asylum was entirely predicated on his membership and participation in MQM. Thus, according to Mr. Janjua, the government easily could have argued against asylum based on MQM being a terrorist organization, especially as the government was on notice of MQM having a history of violence. That the government knew about this history of violence was established at a September 2000 hearing before the immigration judge:

| | |
|---|---|
| Gov't Counsel: | Okay. So what I was asking you is, because it has been suggested by the State Department that the MQM has demonstrated its willingness to use violence and intimidation, did you ever use violence and intimidation as a member of the MQM? |
| Mr. Janjua: | What pressure are you talking about? I have never fought or even argued or quarreled with anyone ever. |
| Gov't Counsel: | That was my question. Have you used violence and intimidation to further the goals of the MQM? |
| Mr. Janjua: | Never. |

CAR 374-75 (hearing). Mr. Janjua also argues that the above exchange shows that the issue of terrorist activity was actually litigated for purposes of collateral estoppel. In addition, as part of his application for asylum, Mr. Janjua provided an excerpt from a publication issued by the U.S. Department of State, which referenced a history of violence with respect to the MQM. *See* CAR 458 (1999 Country Reports on Human Rights Practices, Pakistan) (stating that the MQM "has demonstrated a willingness to use violence to further its objectives"; that, after being formed in the 1980s, the MQM "soon became an organization with criminal elements, which generated income through extortion and other forms of racketeering"; and that MQM "has not been able to separate itself from its violent past").

While the Court is not without some sympathy for Mr. Janjua's position, it is not convinced that the issue of terrorist activity was contested by the parties and submitted for

16

determination by the immigration judge. While the government did make reference to MQM and violence, ultimately, it never argued to the immigration judge that MQM was a terrorist organization; nor did Mr. Janjua ever contend that MQM was not a terrorist organization. While one could argue that the government effectively admitted that MQM was not a terrorist organization (or that the government waived that position) during the asylum proceeding, that does not mean that the "actually litigated" requirement of collateral estoppel has been satisfied. Again, what is at issue here is collateral estoppel, not equitable estoppel. Indeed, as the Restatement (Second) of Judgments notes:

> An issue is not actually litigated if the defendant might have interposed it as an affirmative defense but failed to do so; nor is it actually litigated if it is raised by a material allegation of a party's pleading but is admitted (explicitly or by virtue of a failure to deny) in a responsive pleading; nor is it actually litigated if it is raised in an allegation by one party and is admitted by the other before evidence on the issue is adduced at trial; nor is it actually litigated if it is the subject of a stipulation between the parties.

Rest. (2d) of Judgments § 27, cmt. (e); *see also Whitley v. Seibel*, 676 F.2d 245, 249 & n.8 (7th Cir. 1982) (noting that "[t]here is some authority in this Circuit for treating the failure to raise an issue as tantamount to waiver and for giving the waiver collateral estoppel effect" but that this authority has been "soundly criticized" by the reporter for the Restatement (Second) of Judgments; adding that, in any event, "there must be 'reason to believe that the failure to litigate the matter in fact was a recognition of the opposing claim'"). The Restatement alluded to the reasoning behind this statement as follows:

> There are many reasons why a party may choose not to raise an issue, or to contest an assertion, in a particular action. . . . [Furthermore,] [t]he interests of conserving judicial resources, of maintaining consistency, and of avoiding oppression or harassment of the adverse party are less compelling when the issue on which preclusion is sought has not actually been litigated before. And if preclusive effect were given to issues not litigated, the result might serve to discourage compromise, to decrease the likelihood that the issues in an action would be narrowed by stipulation, and thus to intensity litigation.
>
> It is true that it is sometimes difficult to determine whether an issue was actually litigated; even if it was not litigated, the party's reasons for not litigating in the prior action may be such that preclusion would be appropriate. But the policy considerations outlined above

17

> weigh strongly in favor of nonpreclusion, and it is in the interest of predictability and simplicity for such a result to obtain uniformly.

Rest. (2d) of Judgments § 27, cmt. (e).

Accordingly, the Court holds that, in the instant case, the issue of terrorist activity was not actually litigated (for purposes of collateral estoppel) during the asylum proceeding. The authority on which Mr. Janjua relies is distinguishable. *Compare Islam*, 136 F. Supp. 3d at 1092 (noting that "[t]he DHS cross examined [the plaintiff] during his asylum hearing about his involvement in MQM-A and APMSO" and that "[t]he DHS and [the plaintiff], during closing argument, each addressed whether [the plaintiff] was involved in terrorist activity"); *accord Amrollah*, 710 F.3d at 571 (stating that the "actually litigated" and "necessarily decided" prongs were "easily satisfied" because "[t]he government cross-examined [the plaintiff] extensively about his support of the mujahedeen movement and MeK during the asylum proceeding"). And because the "actually litigated" requirement of collateral estoppel has not been satisfied, Mr. Janjua's motion for summary judgment is denied.

E. <u>Government's Cross-Motion for Summary Judgment</u>

In its motion for summary judgment, the government moved for summary judgment based on the collateral estoppel arguments discussed above. The government further argued that the USCIS did not act arbitrarily or capriciously in characterizing the MQM as a terrorist organization and finding that Mr. Janjua's membership and participation in MQM amounted to terrorist activity. As indicated above, the Court finds that the collateral estoppel doctrine can apply to immigration proceedings such as the one here but that the "actually litigated" element of collateral estoppel has not been satisfied. Therefore, the only issue remaining is whether USCIS acted arbitrarily or capriciously in characterizing the MQM as a terrorist organization and finding that Mr. Janjua's membership and participation in MQM amounted to terrorist activity. As to this specific issue, Mr. Janjua has not made any responsive argument on the merits and, accordingly, the Court deems that argument waived. The Court therefore grants the government's motion for summary judgment.

///

///

18

### III. <u>CONCLUSION</u>

For the foregoing reasons, Mr. Janjua's motion for summary judgment is denied, and the government's cross-motion is granted. The Clerk of the Court is directed to enter judgment in accordance with the above and close the file in this case.

This order disposes of Docket Nos. 28 and 30.

**IT IS SO ORDERED**.

Dated: July 6, 2017

_____
EDWARD M. CHEN
United States District Judge